[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12472
Argument Calendar
_____

D.C. Docket No. 1:13-cv-00176-WS-B


BANK OF BREWTON,

Plaintiff - Counter
Defendant - Appellant,

versus

THE TRAVELERS COMPANIES, INC.,
ST. PAUL GUARDIAN INSURANCE COMPANY,

Defendants - Counter
Claimants - Appellees.


_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(February 9, 2015)

Before TJOFLAT, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

This case requires us to determine whether, under Alabama law, a financial institution bond's definition of "counterfeit"—"an imitation which is intended to deceive and to be taken as an original"—encompasses a duly authorized stock certificate procured under false pretenses.  We hold that it does not.  Accordingly, we affirm the District Court.

I.

The Bank of Brewton (the "Bank"), is a small, privately held bank located in Escambia County, Alabama.  At all times relevant to this appeal, the Bank was covered by a financial institution bond[1] (the "Bond") issued by the Travelers Companies, Inc. ("Travelers").  The Bond provided coverage for, *inter alia*, "loss resulting directly from the [Bank] having, in good faith, . . . extended credit . . . on the faith of [a certificated security], which is a Counterfeit."  The Bond defines "Counterfeit" as "an imitation which is intended to deceive and to be taken as an original."

---

[1] A financial institution bond is essentially a type of insurance coverage for banks.  *See Am. Cas. Co. of Reading, Pa. v. Etowah Bank*, 288 F.3d 1282, 1284 (11th Cir. 2002) ("A financial institution bond is a type of fidelity bond that is designed to insure financial institutions against fraudulent or unfaithful dealings by employees and certain outside parties which could damage the institution.").

Over the years, the Bank made and renewed a number of loans to its long-time customer, Jackson Hines, for which Hines pledged various assets as collateral. In November 2005, as collateral for one of these loans, Hines assigned 180 shares of stock in The Securance Group ("TSG") to the Bank and delivered to the Bank a stock certificate representing these shares ("Certificate No. 2").[2] Either at the same time or at some later date, Hines delivered a second stock certificate to the Bank ("Certificate No. 7"), reflecting the assignment of an additional 180 shares of TSG stock. In March 2009, a Bank employee compared the two certificates and discovered that Certificate No. 2 was actually a color copy of the original Certificate No. 2.

Upon inquiry, Hines explained that he had inadvertently given the Bank a copy and had since lost the original. Hines informed TSG that he had lost Certificate No. 2, asserted that he had not pledged or encumbered Certificate No. 2 other than with the Bank, and requested a replacement certificate. TSG issued a new certificate ("Certificate No. 11") representing the same 180 shares, which Hines then delivered to the Bank.

---

[2] Travelers disputes that Hines actually assigned the shares represented by Certificate No. 2 to the Bank at this point in time, but since the Bank was the non-moving party below, we accept its version of the facts as true for the purposes of this appeal.

3

In December 2009, the Bank consolidated all of Hines's outstanding loans into one loan of approximately $1.5 million and also issued an additional loan of approximately $95,000 to cover the fees associated with the consolidation. These loans were secured, in part, by the 360 shares of TSG stock.

In April 2010, the other shoe dropped. TSG's president, who was also a member of the Bank's board, discovered that in 2007, Hines had assigned the 180 shares of TSG stock represented by Certificate No. 2 to another bank. At that time Hines had also delivered the original Certificate No. 2 to the other bank. TSG's president promptly informed the Bank of this discovery, notifying it that as a result, Certificate No. 11 was void and of no effect. The Bank asked Hines to replace the 180 shares with other collateral, but he instead defaulted on the December 2009 loans and filed for bankruptcy.

The Bank promptly filed a claim with Travelers for the loss incurred by Hines's default. Travelers tentatively took the position that the loss was not covered by the Bond but continued to investigate the claim for the next several years. In February 2013, the Bank filed a breach-of-contract action against Travelers in the Circuit Court of Montgomery County, alleging that the Bank had "sustained a covered loss based on a forged or counterfeit stock certificate," but that Travelers had refused to pay for the loss. Travelers removed to the United States District Court for the Middle District of Alabama and then moved to transfer

4

venue to the Southern District of Alabama.  The motion for transfer was granted, Travelers answered denying the claim, and discovery ensued.

After discovery, Travelers moved for summary judgment.  Travelers argued, *inter alia*, that the Bank's loss was not covered by the Bond because the loss did not stem directly from the Bank's having relied in good faith on the counterfeit Certificate No. 2.  Specifically, Travelers pointed out that the loss complained of by the Bank occurred in connection with the December 2009 loans, and that the Bank knew as early as April 2009 that Certificate No. 2 was a copy.

The Bank then asserted for the first time in its response that *either* Certificate No. 2 or Certificate No. 11 would qualify as a counterfeit security, on which losses stemming directly from good-faith reliance would be covered under the Bond.  Travelers, in its reply brief, contended that it was unaware that the Bank was proceeding on the theory that Certificate No. 11 qualified as a counterfeit, but that, in any event, Certificate No. 11 could not be the basis of a claim under the Bond because it was not a counterfeit.  The Bank moved to strike Travelers's reply brief or, in the alternative, for leave to file a surreply, on the ground that Travelers's argument that Certificate No. 11 was not a counterfeit was "an entirely new position which was not asserted in Travelers' summary judgment motion." After the District Court granted the Bank leave to file a surreply, the Bank

5

contended that Certificate No. 11 *was* a counterfeit because it was intended to replace and represent the original Certificate No. 2.

The District Court granted summary judgment for Travelers. The court considered whether either the copied Certificate No. 2 or the original Certificate No. 11 was a counterfeit security and, if so, whether the Bank's loss was directly caused by good-faith reliance on such certificate. The court found that any loss sustained in connection with Certificate No. 2 was not covered because such a loss did not follow directly from the Bank's reliance on the certificate. Following the discovery that Certificate No. 2 was a copy in April 2009, the Bank had expressly stated that it "considers Certificate #2 null and void and releases Certificate #2 and accepts Certificate #11 as collateral on [Hines's] current debts." Thus, by its own admission, the December 2009 loan could not have been made in reliance on Certificate No. 2, and certainly not in good-faith reliance.

The District Court also concluded that any claim based on a loss flowing from good-faith reliance on Certificate No. 11 was not covered by the Bond. The court explained that Certificate No. 11 was not a counterfeit under the terms of the Bond because it was not an imitation purporting to be an authentic document; rather, Certificate No. 11 *was* an authentic document that happened to be null and void when issued.

6

The Bank timely appealed from the grant of summary judgment. We have jurisdiction under 28 U.S.C. §§ 1332(a) and 1291.

## II.

We review the grant or denial of a motion for summary judgment *de novo.* *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014). In doing so, we review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

On appeal, the Bank argues that the District Court erred in finding that Certificate No. 11 was not a "counterfeit" under the terms of the Bond.[3] Boiled down, the Bank's argument appears to be quite simple: the Bond defines a "counterfeit" as "an imitation which is intended to deceive and to be taken as an original"; and Hines, with the requisite intent, gave the Bank a valueless stock

---

[3] The Bank also argues in the alternative that Travelers has waived, or should be estopped from making, the argument that Certificate No. 11 was not a counterfeit. We reject this argument for the same reasons the District Court did. Specifically, the Bank's response to Travelers's motion for summary judgment articulated a theory of recovery that was not fairly disclosed by the pleadings (that Certificate No. 11 was the counterfeit, not Certificate No. 2), so it was appropriate for Travelers to respond to this argument in its reply brief.

7

certificate that appeared for all intents and purposes to be a valuable stock certificate.

Because Alabama substantive law applies to this diversity action, our task is to divine what an Alabama court would likely hold if presented with this case. *Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 711 (11th Cir. 1985); *cf. Am. Cas. Co. of Reading, Pa. v. Etowah Bank*, 288 F.3d 1282, 1285 (11th Cir. 2002) (applying Georgia substantive law to a diversity dispute concerning coverage under a financial institution bond). To do so, we look first to whether Alabama courts have spoken on the issue. While there does not appear to be any precedent precisely on point, an Alabama Supreme Court opinion cites favorably to a Sixth Circuit case that is instructive. *See Fidelity & Casualty Co. v. Bank of Commerce*, 234 So. 2d 871, 877 (Ala. 1970) (holding that a loss sustained by a bank in reliance on fabricated invoices was not covered by the bank's bond, citing *First National Bank of Memphis v. Aetna Casualty & Surety Co.*, 309 F.2d 702 (6th Cir. 1962) as support for its holding).

In *First National Bank of Memphis*, the Sixth Circuit was confronted with the issue of whether a loss caused by a bank's reliance on warehouse receipts indicating (falsely) that the debtor possessed approximately 1.3 million bushels of soy beans was covered under a bankers blanket bond (the predecessor to a financial institution bond). 309 F.2d at 703–04. The court concluded that the loss was not

8

covered under the bond because the warehouse receipts were not forged or counterfeited. *Id.* at 705. Instead, "[t]hey were signed and issued by the [warehouse owner] and endorsed by [the debtor], all by duly authorized officers. Falsity lies in the representation of facts contained in the warehouse certificates and not in the genuineness of their execution." *Id.*

Construing Texas law, our court has also explained the distinction between fraudulently procured documents and counterfeit documents, in *Bank of the Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir. 1973).[4] In that case, the plaintiff bank brought suit against its insurer under a bankers blanket bond to recover for losses it sustained in reliance on, *inter alia*, a License Receipt and a Title Certificate that purported to provide it with an interest in a 1969 Lincoln Continental. *Id.* at 75. In reality, the loan applicant "had previously sold th[e] automobile and delivered his original title certificate to the purchaser. He then obtained the Title Certificate given to the [b]ank by falsely swearing to the Texas Highway Department that he had lost his original copy."

The bank argued that it should recover because the bond contained a provision covering losses sustained on counterfeited documents. Looking to the

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

definition of "counterfeited," defined in the bond as "only an imitation of a security document or other written instrument . . . which is intended to deceive and to be taken for an original," the court concluded that the bank's loss was not within the coverage provided by the bond. *Id.* at 77 (emphasis omitted). "Both the License Receipt and the Title Certificate were authentic, albeit the product of fraudulent misrepresentations to the State authorities. Thus, neither could have been 'counterfeit.'" *Id.*

We find the reasoning in these cases to be compelling. An attempt to deceive by means of a document that imitates the appearance of an authentic original is not the same as an attempt to deceive by means of false factual representations implicit in an authentic document. To conflate the two, as the Bank would have us do, would "obliterate elementary distinctions among the techniques of deceptions[,] . . . distinctions [which] are recognized in ordinary and commercial usage and . . . preserved in the bond." *Exch. Nat'l Bank of Olean v. Ins. Co. of N. Am.*, 341 F.2d 673, 676 (2d Cir. 1965).

Here, as in *First National*, the falsity at issue "lies in the representation of facts contained in [Certificate No. 11] and not in the genuineness of [its] execution." 309 F.2d at 705. The Bond does not cover losses resulting from every document tainted by fraud. Instead, the Bond provides coverage for a subset of deception-based losses—those stemming from documents that imitate an original.

10

The difference hinges on the nature of the underlying misrepresentation.  While counterfeit documents deceive by misrepresenting *authenticity*, Certificate No. 11's deception concerned a misrepresentation of *value*.  As in *Bank of Southwest,* there is no question that the document at issue was authentic—Certificate No. 11 was issued by TSG and numbered, dated, and signed by the appropriate officer just like every other stock certificate it issues; the problem, simply, was that because it was obtained under false pretenses, it had no value.  *See* 477 F.2d at 77.

## IV.

In sum, we conclude that although Certificate No. 11 was fraudulently procured, and as such, valueless, it was an authentic document and thus not "counterfeit" under the terms of the Bond.  Accordingly, the judgment of the District Court is

AFFIRMED.

11