[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13485
_____

D.C. Docket No. 2:12-cv-01079-WMA

PROGRESSIVE EMU INC.,
f.k.a. Johnson EMU Inc.,

> Plaintiff - Counter
> Defendant -Appellant
> Cross Appellee,

versus

NUTRITION & FITNESS, INC.,

> Defendant - Counter
> Claimant - Appellee
> Cross Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(July 19, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBREÑO,[*] District Judge.

JULIE CARNES, Circuit Judge:

Plaintiff Progressive Emu[1] sued Defendant Nutrition & Fitness alleging various breach-of-contract claims.  Defendant responded with a lawsuit of its own.  After the district court held in a preliminary order that Plaintiff had no contractual rights to a disputed trademark, Plaintiff amended its complaint to assert that Defendant's registered trademark should be cancelled because it was procured by fraud.  The district court disposed of all claims through summary judgment.  The parties have now appealed several of the district court's rulings.

Plaintiff challenges the district court's grant of summary judgment in favor of Defendant on Plaintiff's multiple claims for royalties as well as its trademark-cancellation claim.  Defendant appeals the district court's grant of summary judgment in favor of Plaintiff on Defendant's claim for overpayments.  After careful review and with the benefit of oral argument, we affirm in part and reverse in part and remand for further proceedings.

## I.    BACKGROUND

Plaintiff, an Alabama corporation, raises and slaughters emus for their oil, which purportedly has various anti-inflammatory and soothing properties.

---

[*] Honorable Eduardo C. Robreño, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] Plaintiff was formerly known as "Johnson's Emu Oil."

2

Defendant, a North Carolina corporation, manufactures, markets, and distributes consumer health products.  In 2000, Plaintiff began developing an emu-oil pain cream.  Defendant was brought on board to introduce Plaintiff's cream to mass markets.  Defendant placed its first order for "Super-Strength Blue Emu" with Plaintiff on May 3, 2002.  That same day, Defendant filed an application with the United States Patent and Trademark Office (Trademark Office) for a trademark on the term "Blue Emu,"[2] describing the product as a "topical ointment for use in relieving joint or muscle pain."[3]

One week later, Plaintiff and Defendant executed an Operating Agreement Letter of Intent (Letter of Intent), according to which Defendant would purchase emu oil for its products exclusively from Plaintiff.  Defendant also agreed to purchase 2.3 million units of emu-oil cream[4] from Plaintiff and loan Plaintiff $250,000 to buy additional emu oil.  In return, Plaintiff agreed to grant Defendant "exclusive worldwide distribution, marketing, and advertising rights" for any products containing Plaintiff's emu oil.[5]  The Letter of Intent also stipulated that

---

[2]  Defendant's application listed the mark as "Blue-Emu," but we use "Blue Emu" throughout this opinion.

[3]  Three years later, the Trademark Office registered the Blue Emu mark on September 13, 2005.

[4]  The Letter of Intent refers to the cream as "Pain Solutions Super Strength Blue EMU" and "Super Strength Blue EMU."

[5]  The Letter of Intent allowed Plaintiff to maintain its existing sales contracts until they expired. Plaintiff and Defendant would jointly determine whether to renew these contracts upon their termination.

the parties would "jointly own any current and future trademarks of products that contain [Plaintiff's] [e]mu [o]il."

A 2003 Sales, Marketing and Operating Agreement (the Agreement) between Plaintiff and Defendant expressly superseded their Letter of Intent and any other earlier contracts between the parties. The Agreement altered the parties' relationship in significant ways. First, Defendant agreed to place its orders for emu oil at least 30 days before a requested delivery date. Notwithstanding the notice requirement, Plaintiff agreed to "use its best efforts" to fulfill all orders "as quickly as reasonably possible." Furthermore, if Plaintiff was unable to satisfy any of Defendant's orders within 60 days of the order, Defendant could then purchase emu oil from a third party. However, as soon as Plaintiff became able to supply Defendant with oil and notified Defendant of the same, Defendant would lose its right to purchase oil from a third party. Defendant also agreed not to order more oil than would reasonably be needed for 60 days of production.

Second, rather than pay Plaintiff per unit of cream, Defendant would purchase emu oil from Plaintiff for $118.18 per gallon and pay Plaintiff a royalty of 8% of net revenue from Blue Emu sales and a royalty of 5% of net revenue from sales of any other products containing emu oil.

Third, either party could terminate the Agreement for cause if the other party (1) was in default (defined, in relevant part, as a failure to materially comply with

any term in the Agreement) or (2) failed to make a payment due.  Before termination could occur, the allegedly breaching party was to be given an opportunity to cure the breach.

Fourth, whereas the Letter of Intent contemplated joint ownership of all trademarks for products containing oil harvested from Plaintiff's birds, the Agreement was silent as to ownership.  As for other intellectual property issues, the Agreement prevented Defendant from using Plaintiff's marks without Plaintiff's consent.  And Defendant agreed that all of its products containing Plaintiff's oil would bear Plaintiff's trademark on its packaging.  Finally, the Agreement clarified that Plaintiff and Defendant's relationship would be one of independent contractors.

The Agreement underwent two substantive amendments.[6]  In 2004, the parties stipulated that Plaintiff could develop, market, and sell products containing emu oil "in markets other than the Mass Retail Market."[7]  A 2008 amendment, which the parties refer to as the "Fourth Amendment," worked four major changes to the Agreement.  First, it established an escalating price scale for barrels of oil.[8]  Second, it prohibited Plaintiff from marketing, selling, or distributing emu fat or oil

---

[6]  The parties additionally made two minor modifications to the Agreement, neither of which bears on this lawsuit.

[7]  The Agreement defined "Mass Retail Market" as "all national drug store chains, national supermarket chains, mass market discount retailers and club retailers."

[8]  Specifically, for each calendar year, the first 15 barrels would cost $6,500 per barrel.  The next 10 barrels would cost $8,000 per barrel.  All additional barrels would cost $9,000 per barrel.

to third parties unless Plaintiff obtained Defendant's express consent, which was to be granted if Defendant could not use all of Plaintiff's available supply.  Third, the Amendment released Defendant from its obligation to pay Plaintiff royalties for products other than "Original Blue Emu."  Finally, it extended the Agreement's term to December 31, 2015.

The parties' relationship began to unravel in 2011, when the market price of emu oil spiked.  Defendant allegedly insisted that it had the right to purchase more oil than it actually needed and to resell that excess oil for a profit on the open market.  Plaintiff disagreed.  Defendant then accused Plaintiff of selling oil to third parties in breach of the Agreement.  On September 20, 2011, Defendant notified Plaintiff that Defendant "plan[ned] to purchase *all the oil [Plaintiff] produce[d]* . . . until further notice" and that any sale to a third party would constitute a breach of the Agreement.  The relationship remained strained, yet Plaintiff filled all of Defendant's orders through February 2012.

In March 2012, Defendant sent Plaintiff four purchase orders requesting a total of nine barrels of oil.  Plaintiff wrote to Defendant on March 28 that it could not satisfy Defendant's orders because it had no oil on hand and no birds ready to harvest.  Plaintiff enclosed a copy of a complaint it had filed the day before in

Alabama state court asserting various claims against Defendant.[9]  On April 2 and 13, Defendant covered by purchasing oil from third parties.  Defendant then sued Plaintiff in the Eastern District of North Carolina on April 11 and informed Plaintiff that it would suspend all payments and royalties and would hold these funds until the litigation concluded.  Plaintiff's state-court action was removed to the Northern District of Alabama and consolidated with Defendant's suit, which was transferred to the Northern District of Alabama from the Eastern District of North Carolina.

In June 2012, Plaintiff slaughtered a number of its birds.  Plaintiff did not notify Defendant of its renewed ability to fill Defendant's oil needs but instead sold the oil to a third party on July 16.  Plaintiff then sold 19,000 pounds of emu fat to the same third party in August 2012.  The parties had no contact outside of litigation after March 2012.

## II.    DISCUSSION

The parties have appealed various summary judgment rulings.  We review a district court's grant of summary judgment *de novo*.  *Bank of Brewton v. Travelers Cos.*, 777 F.3d 1339, 1341 (11th Cir. 2015).  In so doing, "we [construe] all

---

[9] Plaintiff's complaint asserted four counts.  Count I alleged that Defendant had breached the Agreement in various ways.  Count II sought declaratory relief concerning the meaning of certain provisions in the Agreement as well as the parties' obligations under the Agreement. Count III sought a declaration concerning the intellectual property rights in Blue Emu.  And Count IV asked for an accounting of Defendant's sales of Blue Emu and its revenues deriving from those sales.

evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Id.* at 1342. "Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## A. Royalties Owed after March 2012

Plaintiff argues that it is entitled to royalties through the end of the Agreement. Defendant moved for summary judgment on this claim, and the district court granted Defendant's motion. Plaintiff appeals that ruling here.

### 1. Abandonment.

The district court found that the parties abandoned the Agreement in March 2012. By its terms, the Agreement was set to terminate on December 31, 2015. By March 2012, Defendant had suspended royalty payments to Plaintiff. Plaintiff had stopped supplying Defendant with emu oil, later selling its oil to a third party without Defendant's consent. And the parties had stopped communicating outside of litigation. For these reasons, the district court concluded that the parties' Agreement was no longer in force and that Defendant was not required to perform its contractual obligations, including paying royalties. Plaintiff appeals that ruling. Plaintiff seeks royalties through the end of the Agreement on December 31,

8

2015.[10]  In the alternative, Plaintiff seeks royalties for sales that occurred before July 2012 when Plaintiff sold emu fat to a third party without Defendant's consent.[11]

Under Georgia law,[12] parties to a contract "may by mutual consent abandon [their] contract . . . so as to make it not thereafter binding." *Brooks v. Boykin*, 392 S.E.2d 46, 47 (Ga. App. 1990) (quoting *Holloway v. Giddens*, 236 S.E.2d 491, 492 (Ga. 1997)).  Abandonment "preclude[s] either [party] from complaining of a breach when both agreed to quit." *Eaves & Collins v. Cherokee Iron Co.*, 73 Ga. 459, 470 (Ga. 1975); *accord Allen Housemovers, Inc. v. Allen*, 219 S.E.2d 489 (holding that parties to a contract cannot sue for a breach that occurs after abandonment).  Georgia law demands that both parties actively and unambiguously disaffirm the contract's continuing validity in order for abandonment to occur. *Allen Housemovers*, 219 S.E.2d at 489–91.

The relevant facts are as follows.  In late March 2012, Plaintiff notified Defendant that it was unable to fill Defendant's March orders for nine barrels of oil.  Throughout this litigation, Plaintiff has explained that it had no birds ready for

---

[10]  Plaintiff does not cite the Agreement in making this argument, but presumably Plaintiff relies on ¶ 2.4 of the Agreement (as amended by ¶ 4 of the Fourth Amendment), which states that Defendant shall pay Plaintiff royalties "during the term of this agreement," and on ¶ 5 of the Fourth Amendment, which extended the term of the Agreement to December 31, 2015.

[11]  Specifically, Plaintiff asserts that "[t]here can be no doubt that [Defendant], at the very least, owes [Plaintiff] the royalty payments from March 2012 through July 2012 or August 2012."

[12]  The district court determined early in the litigation that Georgia law governs the parties' breach-of-contract claims.  Neither party disputes this determination.

slaughter at the time, and Defendant has presented only speculative evidence to the contrary. The Agreement expressly contemplates Plaintiff's inability, despite its best efforts, to fill Defendant's orders.[13] Plaintiff's failure to satisfy Defendant's March orders therefore cannot, by itself, constitute abandonment of the Agreement, unless Plaintiff did not use its best efforts to fill the orders. Assuming that Plaintiff abandoned the Agreement when it sold emu oil to a third party without first obtaining Defendant's consent, that sale did not occur until July 2012, three months after Defendant suspended royalty payments.

The district court also rested its conclusion that abandonment had occurred in March 2012 on the fact that Plaintiff and Defendant stopped communicating with one another outside of litigation as of spring 2012. Silence does not amount to abandonment, however. Nothing in the Agreement requires that the parties communicate for the sake of communication. Even if the Agreement obligates Plaintiff to inform Defendant when Plaintiff has oil to sell following a sales hiatus,[14] the evidence indicates that Plaintiff did not have any oil until June or July 2012, several months after Defendant suspended royalties.

---

[13] We do not address whether Plaintiff used its "best efforts" as required under ¶ 2.2. This is a jury question, as the district court noted.

[14] The parties dispute whether the Agreement required Plaintiff to notify Defendant of its renewed ability to provide oil or whether Defendant was required to continually notify Plaintiff of its desire to purchase oil. As far as efficiency and commonsense business practices are concerned, the former reading is more plausible. Nevertheless, the Agreement does not supply an explicit answer.

## 2. Royalties as compensation for providing oil.

In addition to arguing that the district court properly concluded that the Agreement was abandoned in March 2012—meaning no royalties were due Plaintiff after the date of abandonment—Defendant asserts that royalties were compensation for the exclusive supply of oil. According to Defendant, "the only value that [Plaintiff] provide[d] in order to receive [direct payments for oil under ¶ 2.3 and royalties under ¶ 2.4] is the exclusive supply of emu oil." Under this theory, if Plaintiff failed to supply oil, Plaintiff was not entitled to any payment, including royalties. Defendant's argument presents a question of contract interpretation: Does the Agreement condition royalties on the provision of oil? Under Georgia law, "[t]he construction of a contract is a matter of law." *Claussen v. Aetna Cas. & Sur. Co.*, 380 S.E.2d 686, 687 (Ga. 1989) (quoting O.C.G.A. §13-2-1).

Paragraph 2.4 of the Agreement states:

> In addition to the purchase price of the emu oil provided for in Section 2.3, [Defendant] shall pay [Plaintiff] an overriding royalty payment as follows:
>
> (a) *Super Strength Blue Emu Cream.* Eight percent (8%) of [Defendant's] total revenue received from the sale of Super Blue Emu Cream or any similar product, net of discounts and refunds ("Net Revenues");
>
> (b) *Other Products.* Five percent (5%) of [Defendant's] Net Revenues from sales of all

11

> products other than Super Strength Blue Emu
> Cream sold by [Defendant] containing emu oil.
>
> Such royalty payments shall be paid with respect to Net
> Revenues for each month during the term of this Agreement to
> [Plaintiff] no later than the close of business on the tenth (10th)
> day after the end of each calendar month.

The Fourth Amendment subsequently excised ¶ 2.4(b) from the Agreement so that Plaintiff would receive royalties only on sales of Blue Emu. These are the only provisions that expressly address royalties.

Our analysis begins and ends with the plain language of the Agreement. Paragraph 2.4 directs Defendant to pay royalties "each month during the term of th[e] Agreement." The Agreement does not enumerate any exceptions to Defendant's obligation to pay royalties on a monthly basis. We decline to imply any such exceptions. Moreover, ¶ 2.2 of the Agreement contemplates Plaintiff's inability to supply Defendant with oil. That provision does not specify or imply that Defendant may discontinue royalty payments during this period. Equally important, ¶ 2.2 explicitly states, "The remedies provided by [¶] 2.2 shall be [Defendant's] exclusive remedies for any failure by [Plaintiff] to provide the quantities of emu oil required by [Defendant]." Defendant cannot now avail itself of a second remedy—withholding royalties—to address Plaintiff's inability to provide oil. Doing so would render the exclusive-remedy provision of ¶ 2.2 meaningless.

12

We decline Defendant's invitation to revise the Agreement. *Main Station, Inc. v. Atel I, Inc.*, 378 S.E.2d 393, 395 (Ga. App. 1989) ("[C]ourts are not at liberty to revise contracts even when construing them."). The plain language of the Agreement requires that Defendant pay royalties to Plaintiff on a monthly basis for the duration of the Agreement, irrespective of whether Plaintiff is providing oil. Of course, this is subject to Plaintiff's "best efforts" obligation, and whether Plaintiff used its best efforts to supply oil is a question of fact to be answered by a jury.

Because Plaintiff has raised a genuine issue of material fact as to whether the parties disaffirmed and thereby abandoned the Agreement in March 2012, we reverse and remand the district court's grant of summary judgment in favor of Defendant on the limited issue of royalties withheld after March 2012.[15]

## B. Royalties for Off-the-Books Sales

Plaintiff amended its original complaint to add a claim that Defendant made off-the-books sales of Blue Emu for which it owes Plaintiff royalties. Plaintiff

---

[15] Defendant argues that even if the parties did not abandon the Agreement in March 2012, we may nevertheless affirm the district court's grant of summary judgment on this issue because Plaintiff's filing of this lawsuit on March 28, 2012, caused the Agreement to terminate in late April 2012. Thus, Defendant's obligation to pay royalties ceased at that time. In particular, Defendant contends that the lawsuit served as a Termination Notice under ¶ 4.2 of the Agreement because it alleged that Defendant had committed various contractual breaches. When Defendant failed to cure those alleged breaches within 30 days, so the argument goes, the Agreement terminated pursuant to ¶ 4.2. Defendant pressed this argument below, but the district court did not address it. To the extent this argument is relevant to resolution of Plaintiff's claims on remand, the district court should address Defendant's alternative argument in the first instance.

13

argued that Defendant "falsified its financial records, both in its business dealings with [Plaintiff] and before th[e] [district] court, in order to disguise some percentage of its sales so as to avoid royalty payments on them." At bottom, Plaintiff contends that the amount of emu oil that Defendant purchased would have yielded far more units of Blue Emu than Defendant claims to have produced and sold. Defendant's understatement of its sales thereby necessarily understated the amount of royalties due to Plaintiff.

The district court granted summary judgment to Defendant on this claim after concluding that Plaintiff "put forward no evidence of concealed sales other than its conjectural, best-case-scenario mathematical calculation." In contrast, the court noted, Defendant "produced all of its sales records, compiled by computer during the ordinary course of business, and [] further retained an expert witness, an accountant, who [] reviewed all of [Defendant's] records and found that they appear to be correctly compiled and maintained."

It is true that Defendant's sales records do contradict Plaintiff's assertion that it underreported those sales, and thereby the corresponding royalty obligation. Nonetheless, Defendant's records are not dispositive if, in fact, Plaintiff has offered evidence reasonably creating an inference that, based on the amount of

14

emu oil purchased by Defendant, the latter could have produced substantially more product than reflected in its sales records.[16]

On this point, neither party has been entirely clear in explaining the evidence in support of its respective position. But deciphering the parties' positions as best we can, Plaintiff, on appeal, cites evidence from which, when taken in the light most favorable to Plaintiff, one could infer that a gallon of emu oil would yield substantially more units of product than the 362 units that Defendant claims to be the average yield per gallon. Defendant has not, on appeal, pointed to evidence that would counter the assertion that substantially more product was producible than reflected in its sales figures. Instead, Defendant argues only that the additional oil might not have found its way into final units produced because of waste naturally occurring in the production process and because some of the product was used for promotional samples that were never sold.

Yet, undisputed by Defendant, Plaintiff relies on Defendant's records to argue that the amount of sample produced would have used only 2 barrels of emu oil, leaving 205 barrels unaccounted for, according to Plaintiff's calculations. As to any argument by Defendant that the remaining 205 barrels can be explained as having been lost through the waste naturally occurring in the manufacturing

---

[16] Defendant has never asserted that it was unable to sell the product it produced for sale. Instead, it has argued that any unaccounted for oil never found its way into Blue Emu bottles packaged for sale.

process, so far as we can tell, Defendant never quantifies the amount of waste that could be reasonably attributable to that process. Further, Plaintiff's calculations of the amount of oil remaining unaccounted for, after deducting the amount of oil used in producing the samples, would translate to millions of dollars in sales.

Accordingly, taking the evidence in the light most favorable to Plaintiff, we conclude that there are disputed issues of fact, and we therefore reverse the district court's grant of summary judgment as to this claim.[17]

## C. Royalties for Sales of Six-Ounce Bottles of Blue Emu

Plaintiff also argues, in passing, that Defendant improperly withheld royalties for on-the-books sales of six-ounce bottles of Blue Emu.[18] Plaintiff's complaint does not include a claim for these allegedly withheld royalties. In fact, it appears that Plaintiff raised this argument for the first time in its response to Defendant's motion for summary judgment. There, Plaintiff summarily asserted that "[Defendant's] documents establish that [Defendant] sold approximately $250,000 of six ounce units and [] never paid [Plaintiff] a royalty on the six ounce units."

---

[17] Defendant argues that even if Plaintiff has created a triable issue of fact as to the alleged off-the-books sales, the missing sales necessarily date back as far as 2002, meaning that much of the damages derived from such a claim are time-barred. That may well be, but presumably some of the damages at issue will not be barred, and the district court can, with appropriate instructions, direct the jury to award only those damages that are not time-barred.

[18] In contrast to the alleged off-the-books sales referenced above, the sales of six-ounce bottles are documented.

16

The district court did not expressly address Plaintiff's argument that Defendant was not entitled to summary judgment on this claim for royalties for sales of six-ounce bottles of Blue Emu, nor did it explicitly grant summary judgment in favor of Defendant.[19]  We are unclear whether the district court considered Plaintiff's argument concerning six-ounce bottles of Blue Emu.  It may be that the district court declined to expressly address the argument after finding that a claim for royalties for sales of six-ounce bottles was neither properly pleaded nor adequately briefed.  On remand, the district court should state why it declined to consider Plaintiff's argument concerning royalties for on-the-books sales of six-ounce bottles of Blue Emu and, if appropriate, address the argument.

## D. Deduction of Advertising and Promotional Costs

The parties' Agreement states that Defendant must pay Plaintiff "[e]ight percent (8%) of [its] total revenue received from the sale of Super Blue Emu Cream or any similar product, *net of discounts and refunds ('Net Revenues')*." (emphasis added).  At the district court, Plaintiff argued that Defendant had impermissibly deducted third-party retailers' promotional and advertising expenses from "total revenue received" as "discounts" when calculating royalty payments.

The district court disagreed and found that such expenses constituted discounts.  The district court's reasoning is sound.  The Agreement was

---

[19]  However, in ruling on the parties' summary judgment motions, the district court did state that "[a]ll [] claims [not addressed in the order] are not briefed, and are deemed abandoned."

ambiguous, so the court looked to the parties' course of performance. Plaintiff and Defendant had treated third-party promotional and advertising expenses as discounts during the parties' entire relationship. As such, these expenses were properly subtracted from Defendant's total revenues for purposes of calculating royalties. The district court thus granted summary judgment to Defendant on Plaintiff's claim to the contrary.

On appeal, Plaintiff attempts to explain why certain marketing-related expenses—which Plaintiff refers to as "elective" expenses, whatever that term means—are not deductible for purposes of calculating royalties. Plaintiff also alleges that some of the deductions are otherwise suspect. We do not find Plaintiff's vague and unsupported assertions persuasive. Plaintiff has not produced any evidence that the questioned expenses are anything other than ordinarily deductible marketing costs passed on by third-party retailers. We therefore affirm the district court's grant of summary judgment in favor of Defendant.

## E. Overpayment for Oil

Defendant sued Plaintiff to recover alleged overpayments for emu oil from April 2007 through March 2008. The district court entered summary judgment in favor of Plaintiff on Defendant's overpayment claim. Defendant now appeals that ruling.

Defendant's overpayment claim arises out of a dispute over the definition of the term "barrel." Paragraph 2.3 of the original Agreement provided that Defendant would buy emu oil from Plaintiff by the gallon. But the Fourth Amendment priced emu oil by the barrel. The Fourth Amendment, executed in March 2008, did not define the term "barrel," and after the parties signed the Amendment, a dispute arose over how much oil a barrel should contain. Not surprisingly, Defendant argued for the higher figure and Plaintiff for the lower amount. Defendant asserted that a barrel should contain 55 gallons of emu oil, whereas Plaintiff maintained that a barrel need only contain 52.63 gallons of emu oil. On August 20, 2008, the parties reached an agreement by e-mail according to which Defendant would accept barrels containing only 52.63 gallons of oil and Plaintiff would accept a reduced price.[20]

However, while negotiating this price concession, the parties discovered that Plaintiff had actually switched to 52.63-gallon barrels in April 2007, despite the fact that Plaintiff's sales invoices had reflected sales of 55-gallon barrels of oil. In other words, from April 2007 through March 2008, Plaintiff charged Defendant for 55-gallon barrels despite having supplied 52.63-gallon barrels. Plaintiff admits to the deficiency but argues that it owes Defendant no compensation for the deficient

[20] The first e-mail, from Plaintiff to Defendant, stated, in relevant part: "[O]n the $8,000 barrels we will back the price down by $344.72 per barrel and on the $9,000 barrels that would work out to $387.83 per barrel. We can round these #'s off if it makes sense. Let us know what your thoughts are." Less than 30 minutes later, Defendant replied, "This works for us."

19

barrels because a third-party processor filled the barrels and—unbeknownst to Plaintiff—modified the amount of oil pursuant to a change in industry practice.

The district court granted summary judgment to Plaintiff on Defendant's overpayment claim. The court found that the parties' August 2008 e-mail exchange modified the Fourth Amendment. We agree that the e-mails modified the parties' Agreement on a going-forward basis. However, the district court further concluded that the parties "cannot now go back, in light of [this litigation], and say that, had they known litigation was going to occur anyway, they would have sought damages against each other for the 2008 breaches." The district court thus concluded that if any breaches occurred when Plaintiff was providing 52.63-gallon barrels but charging for 55-gallon barrels, "the parties agreed to settle them on their own terms." The district court cites no record support for this conclusion, and it has no basis in the parties' e-mail agreement, which corrected the pricing going forward only, with no reference to past overpayments. Consequently, Defendant did not settle its claim to past overpayments by e-mail on August 20, and we see no reason why Defendant should be disallowed from pursuing a valid claim for the pre-August 2008 shortages.

As noted above, Plaintiff admits that it supplied Defendant with barrels containing only 52.63 gallons of oil between April 2007 and March 2008. Defendant has therefore raised a genuine issue of material fact as to its claim for

20

overpayments.  We reverse the district court's grant of summary judgment in favor of Plaintiff and remand for further proceedings on this claim.[21]

## F.  The Blue Emu Trademark

### 1.  Defendant's motion to strike.

We first address Defendant's motion before us to strike Plaintiff's licensee-estoppel argument.  On appeal, Plaintiff asserts that Defendant is a licensee of Plaintiff's Blue Emu trademark and should therefore be estopped from contesting Plaintiff's right to the mark.  In its motion to strike, Defendant points out that Plaintiff did not make its licensee-estoppel argument during summary judgment proceedings at the district court or in its initial brief before this Court.  Defendant argues that Plaintiff should not be permitted to raise this argument for the first time at this late juncture.

"[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered."  *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir.

---

[21]  Plaintiff asserts in passing that if Defendant's claim for overpayment is allowed to proceed, then Plaintiff's claim based on the August 20, 2008 modification should also be permitted. Specifically, Plaintiff argued below that Defendant provided no consideration for the price concession and in fact achieved it by duress.  Even if Plaintiff's passing reference sufficiently raises this argument on appeal, we readily dispose of Plaintiff's claim.  As the district court explained:

> [Plaintiff's] argument is not persuasive.  The consideration provided by [Defendant] was that it agreed to accept the barrels containing less emu oil, and "the mere fact that a person enters into a contract as a result of the nature of business circumstances, financial embarrassment, or economic necessity is not sufficient [for a claim of duress]."  *A-T-O, Inc. v. Stratton & Co., Inc.*, 486 F. Supp. 1323, 1325 (N.D. Ga. 1980).

1993).  Plaintiff maintains that it argued in the district court that it had granted Defendant a license to use the Blue Emu mark.  Fair enough, but arguing that Plaintiff granted Defendant a license is different from arguing that Defendant, as a licensee, should be estopped from contesting Plaintiff's rights to the mark.  For this reason, Plaintiff's contention that it raised this argument below is unavailing.

Plaintiff also did not adequately raise the licensee-estoppel argument in its initial brief before this Court.  Plaintiff's brief does list as an issue on appeal the question whether "the trier of fact was required to determine equitable issues because genuine issues of material fact remain with regard to the equitable right of [Plaintiff] to the trademark."  Nevertheless, Plaintiff failed to explore that question in its initial brief and certainly did not raise the licensee-estoppel argument "plainly and prominently."  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).  Accordingly, we need not address it.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").  Defendant's motion to strike is granted, meaning Defendant may contest Plaintiff's claimed right to the mark.

## 2.  Plaintiff's appeal.

A party may petition the Trademark Trial and Appeal Board to cancel a registered trademark at any time if the mark was obtained by fraud.  15 U.S.C.

22

§ 1064(3).  Courts have concurrent jurisdiction to cancel registration "[i]n any action involving a registered mark."  15 U.S.C. § 1119.  Plaintiff asked the district court to cancel Defendant's Blue Emu mark for an alleged fraud that Defendant's chairman, Richard Guy, committed in completing Defendant's trademark application.  Specifically, Plaintiff argued that Guy fraudulently averred in the application oath that "to the best of his[] knowledge and belief no other [party] ha[d] the right to use the [Blue Emu] mark in commerce."  The district court granted Defendant's summary judgment motion and found that Defendant retains sole ownership of the Blue Emu mark.

On appeal, Plaintiff argues that it offered enough evidence to establish a genuine issue of material fact regarding Guy's alleged fraud on the Trademark Office.  Plaintiff emphasizes that at the time Defendant applied for a trademark, Plaintiff "had a superior claim to the mark" that should have been disclosed in the application by Guy.  In support of this argument, Plaintiff offers evidence that it invented the Blue Emu formula and name and had disclosed the formula and name to Defendant under a confidentiality agreement, had sold thousands of units of the cream to Defendant, and controlled Blue Emu manufacturing at the time Defendant submitted its application to the Trademark Office.

Defendant, for its part, urges us to uphold the district court's grant of summary judgment.  Defendant notes that the district court considered whether

23

Plaintiff had any right to the mark at the time of filing and concluded that it did not because Plaintiff had not used the Blue Emu trademark in commerce. Consequently, Guy could not have falsely averred that to the best of his knowledge no one else, including Plaintiff, had the right to use the mark. Defendant then reminds us of Plaintiff's high evidentiary burden in pressing its fraud claim and explains why all the evidence Plaintiff has marshaled is inadequate to defeat summary judgment. Defendant concludes by arguing that Plaintiff's claim is barred by laches and the statute of limitations.

We are unpersuaded by the district court's analysis of Plaintiff's cancellation claim. The court relied almost exclusively on *Sengoku Works Ltd. v. RMC Intern., Ltd.*, 96 F.3d 1217 (9th Cir. 1996), a non-binding opinion from another circuit, despite the fact that more-recent Eleventh Circuit opinions are on point. Moreover, the word "fraud" does not appear in *Sengoku*. In fact, *Sengoku* dealt with a run-of-the-mill trademark-ownership dispute. *Id.* at 1217 ("Sengoku and RMC each claim ownership of the Keroheat trademark."); *id.* at 1219 ("[Both [parties] claim ownership of the Keroheat trademark, and the issue is central to the finding for Sengoku on trademark infringement."); *see also id.* at 1217–21. *Sengoku* has nothing to say about an action under §§ 1064(3) and 1119 to cancel a trademark registration on the basis of fraud in the trademark application. In short, we find the district court's reliance on *Sengoku* inapt, particularly given the existence of other

24

binding precedent.[22]  We similarly disagree with the district court's reliance on

facts that arose *after* Defendant filed its application with the Trademark Office.[23]

These particular facts are irrelevant to the question whether Defendant perpetrated

a fraud in its application.

The district court concluded that "[b]ecause the evidence in this case shows

that [Defendant] *has* the superior claim to ownership," Plaintiff cannot establish

that Defendant committed fraud.  (emphasis added).  But a present superior claim

to ownership is not the test for evaluating a claim that there was fraud in a

trademark application.  That said, Plaintiff nonetheless cannot prevail on its claim.

A trademark applicant commits fraud by "knowingly mak[ing] false, material

representations of fact in connection with an application for a registered mark."

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir.

2008).  A party seeking cancellation due to fraud must prove its claim by clear and

convincing evidence.  *Sovereign Military Hospitaller Order of Saint John of*

*Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the*

---

[22]  There are other problems with relying on *Sengoku*.  For example, in that opinion, the Ninth Circuit explained that in a trademark-ownership dispute between a manufacturer and distributor, the manufacturer is entitled to a presumption of ownership.  *Id.* at 1220.  To track *Sengoku*'s analysis, the district court was forced to assign the titles of "manufacturer" and "distributor" to Plaintiff and Defendant.  The district court concluded that Defendant "is more deserving" of the presumption and should therefore be designated the "manufacturer."  Even if this is true, it makes no sense to label Plaintiff a "distributor."

[23]  For example, the district court considered both the Letter of Intent and the Agreement. Because both these contracts were executed after filing, they should not inform an analysis of Plaintiff's rights when Defendant applied for registration.

*Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1289 (11th Cir. 2012) (citing *Angel Flight*, 522 F.2d at 1209). "This is necessarily a heavy burden, and any doubt must be resolved against the charging party." *Id.* (quotation marks and citations omitted).

To prevail on its fraud claim at trial, Plaintiff would need to establish by clear and convincing evidence that Guy knew or believed that another organization had a right to use the mark. 15 U.S.C. § 1051(a)(3)(D); *see also Sovereign Military*, 702 F.3d at 1290; *Angel Flight*, 522 F.3d at 1211. As a matter of law, Plaintiff has failed to produce evidence sufficient to meet this standard. Guy could not have known or believed that Plaintiff had a right to use the mark when Plaintiff actually had no such right, either by contract or under the common law.

First, Plaintiff did not have a contractual right to use the mark at the time of filing. Any contractual right could have only materialized when the parties executed a Letter of Intent, which did not occur until one week after Defendant submitted its registration application (and nearly a month after Guy executed the accompanying affidavit).

Plaintiff likewise did not possess a common-law ownership right in the Blue Emu mark when Guy submitted his registration application to the Trademark Office. "Common-law trademark rights are 'appropriated only through actual prior use in commerce.'" *Crystal Ent't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313,

26

1321 (11th Cir. 2011) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193–94 (11th Cir. 2001)).  This Circuit applies a two-part test to determine whether a party has demonstrated prior use.  *Id.*  The party claiming a right must present "'evidence showing first, adoption, and second, use in a way *sufficiently public* to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'"  *Id.* (quoting *Planetary Motion*, 261 F.3d at 1193–94) (alteration omitted).  Here, Plaintiff allegedly invented the name "Blue Emu" and circulated it to potential partners, so the "adoption" prong of the prior-use test is satisfied for purposes of summary judgment.

Plaintiff's right to the mark, however, collapses on the second prong, which requires "use in a sufficiently public way."  *Id.*  This Court has previously explained that the use prong was satisfied when "the distribution of the mark was widespread . . . , members of the targeted public actually associated the mark with the product to which it was affixed, the mark served to identify the source of the product, and other potential users of the mark had notice that the mark was in use in connection with the product."  *Id.* (quotation marks, citations, and alteration omitted).

None of these factors is present here.  The only sale at the time of filing was to Defendant itself, and that occurred on the day of filing.  Plaintiff argues that this

27

constitutes using the mark in commerce.  Aside from the temporal issues with this argument, Plaintiff never actually distributed the product to the public.  Indeed, it contracted with Defendant for the express purpose of selling the product on the mass markets.  And the sale of goods to a partner fails to establish a common-law mark under this Circuit's precedent.  *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use.'  Trademark claims based upon shipments from a producer's plant to its sales office, and vice versa, have often been disallowed.");[24] *see also Planetary Motion*, 261 F.3d at 1196 (relying on *Blue Bell* in relevant part).

It is also not clear that other potential users of the Blue Emu mark had notice that the mark was in use in connection with an emu-oil pain cream.  Plaintiff developed Blue Emu two weeks before Guy executed his affidavit and roughly one month before Defendant submitted its registration application, leaving other would-be users a brief window within which to discover Plaintiff's alleged use of the mark.  Plaintiff claims that it had shipped Defendant samples of the product, which arguably would have notified Defendant that Plaintiff was using the mark.  But the evidence cited in support of this proposition refers to the samples simply as

---

[24] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions that the former Fifth Circuit had handed down before the close of business on September 30, 1981.  *Id.* at 1209.

"Arthritis Care."  Plaintiff offered no evidence about the packaging or whether it contained the Blue Emu mark.  That said, Defendant placed an order with Plaintiff for "Super Strength Blue Emu," but only on May 3, 2002—after Guy had signed his affidavit and on the same day that Defendant submitted its application to the Trademark Office.

In sum, Plaintiff cannot show that it had a right to the Blue Emu mark when Defendant submitted its trademark application.  Plaintiff thus falls short in raising a genuine issue of material fact as to whether Defendant fraudulently obtained its registered mark in Blue Emu.  We therefore affirm the district court's grant of Defendant's summary judgment motion on Plaintiff's cancellation claim.  Having done so, we need not address Defendant's argument that Plaintiff's cancellation claim is barred by the statute of limitations or laches.

### III.    CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment in favor of Defendant, ruling that Plaintiff's claim for royalties ended in March 2012.  We also **REVERSE** the district court's grant of summary judgment to Defendant on Plaintiff's claim for royalties on off-the-books sales. We **AFFIRM** all other summary judgment grants in favor of Defendant that Plaintiff appeals.  We **REVERSE** the district court's grant of summary judgment

in favor of Plaintiff on Defendant's claim for overpayments.[25]  The case is

remanded for further proceedings consistent with this opinion.

---

[25]  As explained above, on remand, the district court should rule on whether Plaintiff can proceed on its claim for unpaid royalties for sales of six-ounce bottles of Blue Emu.