[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12804
Non-Argument Calendar

_____

D.C. Docket No. 2:12-cv-01079-AKK


PROGRESSIVE EMU INC.,
f/k/a Johnson EMU Inc,

                              Plaintiff - Appellant Counter - Defendant,

                    versus

NUTRITION & FITNESS INC.,

                              Defendant – Appellee Counter - Claimant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 13, 2019)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

This is the second appeal in a breach of contract dispute between Plaintiff Progressive Emu Inc.,[1] a supplier of emu oil, and Defendant Nutrition & Fitness Inc., a seller of commercial products containing emu oil.  In the first appeal, we reversed the district court's grant of summary judgment on Plaintiff's claims for royalties owed and Defendant's claim for reimbursement of overpayments. *Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F. App'x 785 (11th Cir. 2016).  In this appeal, Plaintiff makes three overarching claims.

First, Plaintiff challenges the district court's grant of summary judgment to Defendant as to the termination date of the parties' agreement.  The court concluded that the agreement terminated on April 27, 2012, while Plaintiff argues that the agreement did not terminate until 2015.  Second, Plaintiff contends that even with a termination date of April 27, 2012, Plaintiff was entitled to royalties based on Defendant's sales during the months of March and April 2012. Acknowledging that the jury concluded otherwise, Plaintiff argues that the district court erred by declining to grant Plaintiff judgment as a matter of law on these royalty claims or, at least, by refusing to grant Plaintiff a new trial on this claim. Third, Plaintiff contends that, as to Plaintiff's claim for past royalties arising from unreported sales by Defendant prior to March 2012, the district court erred when it

---

[1]  Plaintiff was formerly known as "Johnson's Emu Oil."

2

granted Defendant judgment as a matter of law on this claim.  After careful review, we affirm.

## I.    BACKGROUND

Plaintiff, an Alabama corporation, raises and slaughters emus for their oil, which purportedly has various anti-inflammatory and soothing properties. Defendant, a North Carolina corporation, manufactures, markets, and distributes consumer health products, including "Blue Emu," a topical ointment containing emu oil.

### A.    The Sales, Marketing and Operating Agreement

In 2003, the parties entered into a Sales, Marketing and Operating Agreement (the Agreement).  The Agreement provides that Defendant would purchase emu oil from Plaintiff for $118.18 per gallon and pay Plaintiff a royalty of 8% of net revenue from Blue Emu sales and a royalty of 5% of net revenue from sales of any other products containing emu oil.  Defendant agreed to place its orders for emu oil at least 30 days before a requested delivery date. Notwithstanding the notice requirement, Plaintiff agreed to "use its best efforts" to fulfill all orders "as quickly as reasonably possible."  Furthermore, if Plaintiff was unable to satisfy any of Defendant's orders within 60 days of the order, Defendant could then purchase emu oil from a third party.  However, as soon as Plaintiff became able to supply Defendant with oil and notified Defendant of the same,

3

Defendant would lose its right to purchase oil from a third party.  Defendant also agreed not to order more oil than would reasonably be needed for 60 days of production.

The Agreement further provides that either party could terminate the Agreement for cause if the other party (1) was in default (defined, in relevant part, as a failure to materially comply with any term in the Agreement) or (2) failed to make a payment due.  Before termination could occur, the allegedly breaching party was to be given an opportunity to cure the breach.

As noted in our previous opinion, the Agreement underwent two substantive amendments.[2]  In 2004, the parties stipulated that Plaintiff could develop, market, and sell products containing emu oil "in markets other than the Mass Retail Market."[3]  A 2008 amendment, which the parties refer to as the "Fourth Amendment," worked four major changes to the Agreement.  First, it established an escalating price scale for barrels of oil.[4]  Second, it prohibited Plaintiff from marketing, selling, or distributing emu fat or oil to third parties unless Plaintiff obtained Defendant's express consent, which was to be granted if Defendant could

---

[2]  The parties additionally made two minor modifications to the Agreement, neither of which bears on this lawsuit.

[3]  The Agreement defined "Mass Retail Market" as "all national drug store chains, national supermarket chains, mass market discount retailers and club retailers."

[4]  Specifically, for each calendar year, the first 15 barrels would cost $6,500 per barrel.  The next 10 barrels would cost $8,000 per barrel.  All additional barrels would cost $9,000 per barrel.

4

not use all of Plaintiff's available supply.  Third, the Amendment released

Defendant from its obligation to pay Plaintiff royalties for products other than

"Original Blue Emu."  Finally, it extended the Agreement's term to December 31,

2015.

### B.     The District Court Action and First Appeal

In 2011, the market price of emu oil spiked and the parties' disagreed over

their rights and obligations under the Agreement.  The parties' dispute eventually

landed in the United States District Court for the Northern District of Alabama.

The district court granted summary judgment in favor of Defendant on Plaintiff's

multiple claims for royalties on sales of products containing emu oil.  The district

court also granted summary judgment in favor of Plaintiff on Defendant's claim

for overpayments.  On appeal, we reversed and remanded as to Plaintiff's royalty-

related claims.[5]  *Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F. App'x

785 (11th Cir. 2016).

### C.     Proceedings on Remand

On remand, and now assigned to a new judge, the district court granted

summary judgment as to the question when the agreement terminated, finding that

the parties' agreement terminated on April 27, 2012.  It then conducted a jury trial

to determine any royalties owed Plaintiff before that date.  In rendering a verdict

---

[5] We also affirmed the district court's grant of summary judgment for Defendant on a trademark cancellation claim brought by Plaintiff.  That trademark claim is not relevant to this appeal.

on this issue, the jury was asked: "Did [Plaintiff] fail to use its best efforts to fulfill [Defendant's] orders for emu oil in March 2012?" The jury answered, "Yes." That verdict precluded Plaintiff from obtaining royalties for March and April 2012. Plaintiff also claimed at trial that Defendant owed royalties for earlier unreported sales of products containing emu oil going back to January 2006. The district court, however, granted judgment as a matter of law to Defendant on that claim and did not submit the issue to the jury.

On appeal, Plaintiff raises 30 issues concerning the district court's handling of various matters on remand. As noted, Plaintiff argues that the court erred in: (1) concluding, as a matter of law, that the contract terminated in April 2012; (2) failing to grant Plaintiff judgment as a matter of law, or a new trial, on its claims for March and April 2012 royalties; and (3) directing a verdict for Defendant on Plaintiff's claim for royalties due on earlier unreported sales.

## II.    DISCUSSION

### A.    The District Court Correctly Ruled that the Agreement Terminated on April 27, 2012

Plaintiff asserts that it is entitled to royalties on Defendant's sales of Blue Emu through December of 2015, which the Agreement indicated to be the termination date for the contract. In the first appeal, we reversed the district court's summary judgment determination that the agreement ended in March 2012, based on the particular ground relied on by the court. *Progressive Emu*, 655 F.

6

App'x at 791–92.  However, we instructed the district court to consider on remand Defendant's alternative argument that Plaintiff's filing of this lawsuit on March 28, 2012, triggered termination of the Agreement following a 30-day cure period.  *Id.* at 792 n.15.

On remand, the district court determined on summary judgment that the agreement terminated on April 27, 2012 and that Plaintiff was not entitled to royalties after that date.  The district court found that Plaintiff's complaint, filed on March 28, 2012, served as a written notice of default triggering Defendant's time to cure under the agreement.  The court further ruled that the agreement terminated when Defendant did not cure the alleged breach within the 30-day cure period of Section 4.2 of the Agreement.[6]

We review the district court's grant of summary judgment *de novo*, considering all the evidence in the light most favorable to Plaintiff as the nonmoving party.  *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019).  Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[6]  The district court originally ruled that the Agreement terminated in July 2012, 90 days after Plaintiff filed its complaint.  The court later amended its judgment to reflect that the Agreement terminated 30 days after Plaintiff filed its complaint.

Plaintiff contends that it "did not terminate the Agreement and summary judgment is dud [sic] to be reversed" because the district court misinterpreted the termination provisions of the Agreement in holding that its complaint triggered termination.  Section 4.2 of the Agreement states, in relevant part, that "[e]ither Party shall have the right to terminate this Agreement for cause at any time by written notice (a "Termination Notice") to the other if:  (a) the other Party is in default (as specified in Section 5 below)[7] under this Agreement; [or] (b) the other party has failed to make any payment of amounts owed hereunder when due . . . ."[8] Section 4.2 further provides that upon delivery of a Termination Notice the defaulting party has thirty days to cure a default for failure to make an owed payment and ninety days to cure other defaults.  "If such default has not been cured by the end of the relevant cure period, this Agreement shall terminate at the end of such period immediately without further notice."

Plaintiff argues that "[p]ursuant to the plain meaning of these provisions, [it] was 'entitled', not 'required', to terminate the Agreement" upon Defendant's failure to pay royalties owed and that it did not intend for its complaint to be a

---

[7]  In relevant part, Section 5 states that "[a] party shall be in default hereunder if (a) such Party fails to comply in any material respect with any term or condition under this Agreement . . . ."

[8]  Likewise, Section 5.2 makes clear that an uncured default entitles the notifying party to terminate the Agreement.  While Section 5.2 refers to cure and termination provisions of Section 4.3, the Agreement does not have a Section 4.3 and neither party disputes that Section 4.2 controls.

Termination Notice as defined in Section 4.2. Plaintiff maintains that the Agreement could only be terminated if it followed "a two-step process." Plaintiff asserts that it first had "to send a written default notice with a cure period" and then had "to send a written termination notice" to Defendant for the Agreement to terminate in accordance with Section 4.2. Plaintiff reasons that it did neither, characterizing its complaint as merely reflecting its election to sue for breach of contract damages, rather than to terminate the Agreement. Plaintiff proclaims that "[t]here is no allegation in [Plaintiff's] Complaint that could possibly evidence [Plaintiff's] election to terminate the Agreement."

The district court found that "[t]he Agreement does not require any specific language to evince the intent to terminate; rather, it only requires that the defaulting party receive notice of the default and an opportunity to cure." The district court explained that "based on a plain reading of the Agreement, after notice of a default, in the absence of an attempt to cure, the Agreement automatically terminates at the end of the relevant time period." The district court deemed Plaintiff's letter notifying Defendant of its lawsuit a notice of default in accordance with Section 4.2 of the Agreement. In finding that Plaintiff's complaint triggered Section 4.2's automatic termination clause, the district court noted that the complaint expressly sought a declaration that "[Defendant's] breaches of contract are material breaches and excuse [Plaintiff's] further

9

performance under the contract." (emphasis added).  The district court rejected Plaintiff's contentions that the parties' actions, following Plaintiff's filing of the lawsuit, evidenced an intent not to terminate the Agreement.  The court noted that (1) Defendant's President testified that he viewed Plaintiff's lawsuit as notice of its intent to terminate the contract; (2) the parties ceased all communications once the suit was filed; and (3) Plaintiff began selling emu oil to third parties in violation of Section 3 of the Agreement.

The district court did not err in concluding that, under these facts, Plaintiff's letter notifying Defendant of its lawsuit constituted a termination notice in accordance with Section 4.2 of the Agreement.  Plaintiff's complaint details Defendant's alleged material breaches of the Agreement, including non-payment of royalties, and expressly seeks a declaration that it is excused from further performance of the contract.  Though not formally styled a "Termination Notice," Plaintiff's letter, coupled with its complaint, satisfies the written notice requirement of Section 4.2.  *See McDonald's Corp. v. Watson*, 69 F.3d 36, 44 (5th Cir. 1995) (a complaint that was personally served on defendants satisfied the notice of termination requirements of a franchise agreement); *Del Lago Ventures, Inc. v. QuikTrip Corp.*, 764 S.E.2d 595, 598 (Ga. Ct. App. 2014) ("The general rule in determining contract compliance is substantial compliance, not strict compliance, and this rule applies to a contract's termination clause as well."

(quotation marks omitted)).  That the complaint sought a declaration of material breach excusing Plaintiff's performance belies Plaintiff's contention that its lawsuit merely sought damages for past breaches and that it intended the Agreement to remain in force.[9]  So too does Plaintiff's subsequent violation of the its contractual obligation to refrain from selling emu oil to third parties.

We also reject Plaintiff's contention that the Agreement requires a two-step process, a default notice and a subsequent termination notice, for termination in accordance with Section 4.2.  The plain language of Section 4.2 makes clear that only a "Termination Notice" is required and that, if the default specified in the Termination Notice is not "cured by the end of the relevant cure period, this Agreement shall terminate at the end of such period immediately *without further notice*."[10]  We must enforce the clear terms of the Agreement.  *Azzouz v. Prime Pediatrics, P.C.*, 675 S.E.2d 314, 319 (Ga. Ct. App. 2009).  Accordingly, the district court correctly held that the Agreement terminated 30 days following Plaintiff's March 28, 2012, filing of the complaint, which sought a declaration that

---

[9]  Plaintiff's argument that "[t]here is no precedent . . . in which a non-defaulting party cannot sue for breach of contract without first forfeiting the contractual right to recover for a breach of contract" misses the mark.  Plaintiff could have sued for past royalties owed without terminating the Agreement.  It could also have sought a declaration that the Agreement remained in force.  Instead, Plaintiff sought royalties and a declaration that it no longer had any obligations under the Agreement—a clear indication of its intent to terminate the Agreement.

[10]  Because Plaintiff's complaint seeking a declaration that it had no further obligations under the agreement constitutes a Termination Notice that clearly reflects an intent to terminate the Agreement, we need not address the district court's broader finding that a mere notice of default, followed by a failure to timely cure, is sufficient to terminate the Agreement.

11

Plaintiff's obligations under the Agreement were terminated because of Defendant's material breach.[11]

> **B.     The District Court Properly Denied Plaintiff's Motions for Judgment as a Matter of Law, or a New Trial, on the Question Whether Plaintiff Used Its Best Efforts to Supply Defendant with Emu Oil**

The district court's conclusion that the agreement terminated on April 27, 2012 meant that Plaintiff might still be entitled to royalties under the agreement for the months of March and April 2012, assuming that Plaintiff had not, itself, breached the agreement during this time period.  Plaintiff's hope for royalties during this two-month period, however, were dashed when the jury, in response to a special verdict interrogatory, indicated that Plaintiff "fail[ed] to use its best efforts to fulfill [Defendant's] orders for emu oil in March 2012." Specifically, prior to the jury verdict and at the close of Defendant's case, Plaintiff had sought a judgment as a matter of law holding that Plaintiff had used its best efforts to fill Defendant's orders.  The district court declined to grant the motion. Following the jury's verdict finding against Plaintiff on this point, Plaintiff renewed its motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure seeking a ruling, as a matter of law, that Plaintiff had

---

[11]  Plaintiff contends in its reply brief that it is entitled to royalties even after it terminates the agreement for cause.  However, issues raised for the first time in reply are waived.  *See United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999).

satisfied the "best efforts" requirement of the agreement.  Alternatively, Plaintiff sought a new trial on the question, pursuant to Rule 59(a).  The district court denied both motions, and Plaintiff now appeals.

We review Plaintiff's Rule 50(b) motion for judgment as a matter of law *de novo*, applying the same legal standard as the district court.  *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).  "We review a ruling on a motion for a new trial for abuse of discretion."  *Id.* at 1255.  "Deference to the district court 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed.'"  *Id.*, quoting *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247–48 (11th Cir. 2001).

1.    Sufficient Evidence Supports the Jury's Verdict that Plaintiff Failed to Use Its Best Efforts to Supply Defendant with Emu Oil in March 2012

Plaintiff asserts that it is entitled to judgment as a matter of law because the evidence demonstrates it used its "best efforts" to supply Defendant with emu oil in March 2012.  "Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  *Gowski v. Peake*, 682 F.3d 1299, 1310–11 (11th Cir. 2012), citing Fed. R. Civ. P. 50.  We review the evidence in the record and draw all reasonable inferences in favor of Defendant, the nonmoving party.  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (citing

13

*Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 148–51 (2000)). "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (internal citations and quotation marks omitted).

Plaintiff argues, as it did below, that it "put forth evidence that it did not have any oil or fat on hand to fulfill [Defendant's] orders and its birds were not ready to process." Plaintiff further argues that the Agreement did not require it to obtain emu oil from other sources to supply to Defendant and that Defendant's sole remedy was to purchase oil from third parties.

In denying Plaintiff's motion for judgment as a matter of law, the district court acknowledged that Plaintiff introduced evidence indicating that "it lacked both the oil to fill [Defendant's March 2012] order and the money to purchase replacement oil from another source." However, the district court explained that "[t]he evidence also indicated that [Plaintiff] did not seek to acquire oil in the spot market via credit, as it subsequently demonstrated the ability to do, did not communicate with [Defendant] regarding the oil shortage beyond stating it was unable to fill the order at the same time it provided [Defendant] notice that it had filed the instant lawsuit, and that it otherwise failed to assist [Defendant] in finding a replacement source for the oil." The district court further found that Plaintiff's

14

argument that Defendant's sole remedy for Plaintiff's failure to fill an order was to purchase replacement oil in the market read the "best efforts" provision out of the Agreement and was foreclosed by a prior unappealed ruling that the Agreement required Plaintiff "to use all reasonable efforts in good faith to fulfill [Defendant's] orders for emu oil." The district court concluded that Defendant presented evidence showing that Plaintiff did not take any steps, beyond bare notification, to supply the requested oil in March 2012 and that this evidence was sufficient to support a jury verdict finding that Plaintiff failed to use its best efforts to supply the oil Defendant requested in March 2012.

We agree with the district court and find no basis to overturn the jury verdict. First, Plaintiff's suggestion that we resolved this issue in the first appeal is unpersuasive. While we acknowledged that "[t]he Agreement expressly contemplates Plaintiff's inability, despite its best efforts, to fill Defendant's orders" by permitting Defendant to purchase oil in the marketplace when not available from Plaintiff, we specifically stated that "[w]e do not address whether Plaintiff used its 'best efforts' as required under ¶ 2.2" of the Agreement and noted that "[t]his is a jury question." *Progressive Emu*, 655 F. App'x at 791 at n.13. That the Agreement allows Defendant to purchase oil in the marketplace as a last resort if Plaintiff fails to supply ordered oil does not excuse Plaintiff from exercising its best efforts to supply the requested oil.

15

Second, a legally sufficient evidentiary basis exists for the jury's verdict that Plaintiff failed to use its best efforts to supply Defendant emu oil, especially when the evidence is evaluated in the light most favorable to Defendant. The Agreement does not limit Plaintiff's "best efforts" to supplying requested oil from its inventory and the evidence showed that Plaintiff made no effort to otherwise fulfill Defendant's order when other sources were available.

Plaintiff unpersuasively argues that "even if [it] would have had a duty to purchase the oil to sell to [Defendant] or borrow the oil and pay for it later, there is no evidence that [Plaintiff] could have done either." However, the evidence showed that Plaintiff made no effort to do either and thus failed to use its best efforts to supply the requested oil. For instance, Plaintiff did not contact its regular processor for emu oil, LB Processors, to try to fill the order. Moreover, the evidence also showed that Plaintiff had purchased oil on the open market, that oil was available for Plaintiff's purchase in March 2012, and that LB Processors sold oil to Plaintiff on credit a few months later, all facts that significantly undermine Plaintiff's excuses for doing nothing to supply Defendant's March 2012 order.[12] Plaintiff's failure to explore readily available options for supplying the oil ordered by Defendant in March 2012 supports the jury verdict that Plaintiff did not use its

---

[12] The evidence is sufficient to support the verdict even if Defendant bore the burden of demonstrating that Plaintiff failed to use its best efforts to supply oil.

16

best efforts to supply Defendant's ordered oil.  Accordingly, the district court properly denied Plaintiff's Rule 50(b) motion.

> 2.     No Grounds Exist for Granting a New Trial on "Best Efforts"

Plaintiff contends the district court erroneously denied its motion for a new trial pursuant to Rule 59(a) on the best efforts issue, arguing three points of error: (1) the court improperly instructed the jury regarding the burden of proof; (2) the court improperly prevented it from presenting evidence that Defendant did not require the oil it ordered in March 2012; and (3) the evidence failed to establish a material breach.  We address each of those contentions in turn.

> a)     The District Court Properly Instructed the Jury on "Best Efforts"

Plaintiff contends that the district court's jury instruction wrongly shifted the burden to it to prove that it had used its best efforts to supply emu oil.  The district court instructed the jury that "[y]ou must determine whether [Plaintiff] has proven, based on the preponderance of the evidence, that it used its best efforts, as defined here, to fulfill [Defendant's] March 2012 order for emu oil."

Motions for new trial based on erroneous and prejudicial jury instructions are within the district court's discretion and are reviewed for abuse of discretion. *Gowski*, 682 F.3d at 1310.  "In conducting this examination, we review jury instructions *de novo* to determine whether they misstate the law or mislead the

17

jury." *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018) (quotations marks omitted).

Without citing any supportive cases, Plaintiff contends that the issue of "best efforts" is an affirmative defense for which Defendant carries the burden of proof. Defendant counters that it is an element of the breach of contract claim for which Plaintiff carries the burden of proof, as the district court explained in rejecting Plaintiff's motion for a new trial.

Plaintiff's allegation of an improper jury instruction does not provide a basis for granting a new trial. First, Plaintiff cites no authority in support of its position that Defendant had the burden of proving that Plaintiff failed to comply with the Agreement. "Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived." *N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998).

Second, we agree with the district court's assessment that Georgia courts require a plaintiff seeking breach of contract damages to demonstrate performance of their obligations under the contract. As we previously noted, "[t]he district court determined early in the litigation that Georgia law governs the parties' breach-of-contract claims" and neither party disputes this determination. *Progressive Emu*, 655 F. App'x at 791 n.12. Under Georgia law, "[a] person who seeks recovery under an alleged executed contract must show performance on his

18

part or that his nonperformance was caused by the act or fault of the opposite party." *Clark's Super Gas, Inc. v. Tri-State Sys., Inc.*, 200 S.E.2d 472, 473 (Ga. Ct. App. 1973) (quotation marks omitted); *Jones v. Brawner*, 287 S.E.2d 255, 256 (Ga. Ct. App. 1981) ("A plaintiff seeking to enforce an alleged contract has the burden and must show performance on his part; otherwise, he is not entitled to a verdict against the defendant."). Plaintiff failed to address those cases, which the district court cited. Accordingly, we find no error in the jury instruction that required Plaintiff to prove it used its best efforts to supply oil ordered by Defendant in March 2012.

> b)    The Relevance of Evidence that Defendant Did Not Require Oil in March 2012

Plaintiff cursorily argues that the district court erroneously excluded evidence that Defendant did not need the oil it ordered in March 2012. We find this argument unpersuasive because it relies on an outdated version of the Agreement.

Section 2.2 of the Agreement originally restricted Defendant from "plac[ing] orders for emu oil in quantities greater than are reasonably expected to be needed to allow its contract manufacturer to maintain on hand an inventory of emu oil reasonably expected to be required to fulfill its requirements for sixty (60) days." But the Fourth Amendment made in 2008 expanded Defendant's rights to purchase emu oil by providing Defendant the discretionary right to buy all emu oil that

19

Plaintiff had available for purchase.  In its original summary judgment order construing the Agreement, the district court found that after the Agreement was amended on March 11, 2008, Defendant was no longer bound by the quantity restrictions of Section 2.2 and could order "any amount of emu oil and emu fat that [Plaintiff] has available for sale if it gives [Plaintiff] notice of its desire before the excess is sold by [Plaintiff] to others."  Plaintiff did not appeal that construction of the Fourth Amendment and we see no error in the construction.  Accordingly, the district court did not err in excluding evidence concerning whether Defendant ordered more than it needed to fill its requirements for 60 days as originally provided in Section 2.2.[13]

   c) Materiality of Plaintiff's Breach for Failure to Use Best Efforts to Supply Defendant's Ordered Oil

Plaintiff argues that its failure to use its best efforts to fulfill Defendant's March 2012 order was not a material breach excusing Defendant from paying royalties because Defendant was able to buy oil in the marketplace.  "A breach is material when it is so substantial and fundamental as to defeat the object of the contract."  *Vidalia Outdoor Prod., Inc. v. Higgins*, 701 S.E.2d 217, 219 (Ga. Ct. App. 2010).  Here, the object of the Agreement as amended was for Plaintiff to use

---

[13]  The district court permitted Plaintiff to admit evidence and argue that Defendant's orders almost doubled in the first quarter of 2012 over their historic orders.  Thus, the impact of Defendant's increased orders on Plaintiff's ability to fulfill its obligations under the Agreement was before the jury.

20

its best efforts to fulfill Defendant's oil orders at the contracted rate. As explained above, Plaintiff made no effort to fulfill Defendant's March 2012 order, defeating the object of the Agreement. That Defendant was able to buy oil in the marketplace at a price higher than the contracted rate does not render Plaintiff's breach immaterial.

For all the reasons above, the district court correctly denied Plaintiff's motion for a new trial based on alleged errors in adjudicating the "best efforts" issue.

### C.    The District Court Did Not Err in Granting Judgment as a Matter of Law for Defendant on the Issue of Off-the-Book Sales

Plaintiff argues that the district court erred in granting Defendant's motion for judgment as a matter of law on its claim that Defendant failed to pay royalties on alleged off-the-book sales. "We review a district court's grant of judgment as a matter of law *de novo*, evaluating whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law." *Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267–68 (11th Cir. 2003) (quotation marks omitted). The evidence is evaluated in the light most favorable to the non-moving party. *Id.*

We addressed Plaintiff's off-the-book sales claim in the first appeal after the district court granted Defendant summary judgment. *Progressive Emu*, 655 F.

21

App'x at 793–94.  We explained that "[t]he district court granted summary judgment to Defendant on this claim after concluding that Plaintiff 'put forward no evidence of concealed sales other than its conjectural, best-case-scenario mathematical calculation'" that the amount of emu oil that Defendant purchased would have yielded far more units of Blue Emu than Defendant claims to have produced and sold.  *Id*. at 793.  We noted that the district court contrasted Plaintiff's effort with Defendant who "produced all of its sales records, compiled by computer during the ordinary course of business, and [] further retained an expert witness, an accountant, who [] reviewed all of [Defendant's] records and found that they appear to be correctly compiled and maintained."  *Id*.  We lamented the lack of clarity in the evidence on both sides but found that, taking the evidence in the light most favorable to Plaintiff, there were disputed facts as to whether Defendant could have produced substantially more product from the emu oil it purchased than what it sold and reported to Plaintiff for royalty purposes.  *Id*. at 793–94.

On remand, the parties tried Plaintiff's off-the-book sales claim before the jury.  However, at the close of evidence, the district court granted judgment as a matter of law for Defendant, deeming Plaintiff's evidence that Defendant produced more product than it reported too speculative to warrant consideration by the jury.

In rejecting Plaintiff's motion to vacate the judgment, the district court noted that "[Plaintiff] relied solely on two pieces of documentary evidence, [Defendant's] sales figures from 2005 through 2012 and a [Defendant] purchase order from 2002 which provided data approximating the amount of product producible per gallon of emu oil."  The court explained that the 2002 purchase order "is the only evidence in the record providing information pertaining to production" that could enable the fact finder to draw conclusion about the amount of product Defendant could have produced with the oil it ordered.  The court considered the 2002 purchase order insufficient to carry Plaintiff's burden of proving off-the-book sales because:  (1) the purchase order expressly states the included production figures were approximations; (2) Plaintiff submitted no evidence explaining the relationship between the approximation and actual production; (3) the approximation came from Defendant, not Defendant's processor responsible for turning the purchased oil into saleable products; (4) the approximations were from 2002, "years before the relevant time period"; and (5) Plaintiff presented no evidence linking the 2002 approximations to the relevant time period or processing company.  Compounding the evidentiary weakness of the 2002 purchase order, the district court noted that Plaintiff failed to:  (1) identify any accounting irregularities; (2) present expert testimony regarding expected sales figures to rebut the testimony of Defendant's expert who testified about waste

23

generated in production and marketing and promotion methods that resulted in non-saleable uses of produced product; and (3) failed to present any evidence related to actual production numbers.  The district court concluded that judgment as a matter of law for Defendant was warranted because "despite litigating this case for over five years, [Plaintiff] has failed to produce even the most basic evidence supporting its off-the-book sales claim."

On appeal, Plaintiff contends that the district court was obligated to send the off-the-book sales claim to the jury because our earlier opinion found the evidence sufficient to survive summary judgment and because the district court ignored or improperly excluded evidence which would have established sufficient evidence to send the off-the-book sales claim to the jury.  We disagree.

1.    The District Court Did Not Err in Granting Judgment as a Matter of Law to Defendant on Plaintiff's Claim for Off-the Book Sales

We are not persuaded by Plaintiff's assertion that our summary judgment decision precluded judgment as a matter of law.  Although the evidentiary standards for summary judgment under Rule 56 and judgment as a matter of law under Rule 50 are the same, the trial record assessed by the district court differed from that on summary judgment, where we expressly noted that "neither party has been entirely clear in explaining the evidence in support of its respective position" on off-the-book sales and also indicated that we had endeavored to "decipher[] the

24

parties' positions as best we [could]." *Progressive Emu*, 655 F. App'x at 793.  The evidence (or lack thereof) is now clear and the record as developed at trial supports the district court's grant of judgment under Federal Rule of Civil Procedure 50(a).

It was important to our summary judgment decision that Plaintiff's meager evidence concerning the amount of emu product that could be produced from the sold oil was "unrebutted." *Id.*  Indeed, on the summary judgment before the earlier panel, Defendant offered attorney argument but did "not . . . point[] to evidence that would counter the assertion that substantially more product was producible than reflected in its sales figures." *Id.* at 794.  That was not the case at trial.  As the district court noted, Defendant "presented unrebutted testimony regarding the level of waste typically generated during the production process and its aggressive marketing strategy utilizing free samples and other product promotion methods which resulted in non-saleable uses of product."[14]

---

[14]  Larry Chriscoe, a former President of Defendant, testified that the manufacturing process typically resulted in 5 to 10 percent waste of an ingredient like emu oil.  He further testified that Defendant gave away "[p]robably a couple million" samples of Blue-Emu product containing emu oil purchased from Plaintiff.  Chriscoe also testified that "probably [] a couple of hundred thousand units" were included in "buy one get one free" offers for which no royalties were owed.  Defendant similarly included two ounces of free product in sales promotions at Walmart totaling "probably a couple of hundred thousand units."  Chriscoe also testified that roughly 2000 units were returned, salvaged or destroyed by retailers and that Defendant provided a ten percent discount to certain retailers that reduced revenue per unit.  Supporting the contention that sold items, samples, and product promotions account for the allegedly missing product revenue and royalties, Defendant's financial auditors never found any unreported revenue from the sale of any of Defendant's products and that financial auditors never found that there were any sales of Blue-Emu product that weren't recorded in Defendant's financials.

25

Further diminishing an already weak case, as explained below, Plaintiff ultimately failed to tender the testimony of Doug Johnson upon which it relied on summary judgment. Johnson operated Cosmetic Labs, a lab that initially produced emu product for Plaintiff in 2002. His testimony could have provided some support for the notion that the product yield approximations provided in the 2002 sales order were reasonable, although he apparently had no experience with the process used by Defendant's lab, Garden State Nutritionals,[15] in the relevant time period. Without Johnson's testimony, the trial record is even less compelling than what Plaintiff submitted on summary judgment.

Further undermining Plaintiff's off-the-book sales claim, it is now apparent that Plaintiff's argument that Defendant's lab (Garden State Nutritionals) produced and Defendant sold more emu-oil product than it reported is based on estimates of what a <u>different</u> <u>manufacturer</u> (Cosmetic Labs) could produce at a <u>different</u> <u>time</u> (2002) with a <u>different</u> <u>process</u> that yielded a <u>different</u> <u>product</u> from products produced in the relevant time period. The earlier product formulation for which production estimates were made in 2002 used 10 percent emu oil. Products produced during the relevant period contained 7 percent emu oil. Plaintiff failed to

_____

In contrast, Plaintiff offered no rebuttal evidence, much less from a financial expert, suggesting that Defendant's financial records failed to accurately report all sold products for which Defendant owed Plaintiff a royalty.

[15] Garden State Nutritionals is also referred to in the record as Celmark.

26

admit any probative evidence demonstrating that the process used by Garden State Nutritionals to produce 7 percent product in the relevant time period would be expected to yield proportionally the same production per gallon of oil as the process used by Cosmetic Labs to produce a product with a different formulation. To the extent Plaintiff's witnesses suggested that the process used by Garden State Nutritionals in the relevant period would be expected to yield the same production as Cosmetic Labs' process for producing a product with a different formulation, they offered no foundation for that testimony. To the contrary, they admitted not having knowledge of the process used to make product in the relevant period.

In view of the unrebutted testimony and evidence at trial concerning the production process employed to produce Defendant's products during the relevant time period, and the amount of product lost to waste, promotion, or salvage, Plaintiff's unsubstantiated speculation concerning approximately how much of a different product a different manufacturer could make at an earlier time is insufficient to reasonably establish that Defendant produced and sold more product than it reported in the relevant time period and avert judgment as a matter of law. "[Judgment as a matter of law] need not be reserved for situations where there is a complete absence of facts to support a jury verdict." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). "If the facts and inferences point overwhelmingly

27

in favor of one party, such that reasonable people, in the exercise of impartial judgment, could not arrive at a contrary verdict, then the motion was properly granted. *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1119 (11th Cir. 1992) ("A mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question."). Based on the evidence admitted at trial, no reasonable juror could conclude that Defendant's yield of product per gallon of emu oil purchased from Plaintiff was lower than it should have been given the process its lab used and the product formulation it was making, much less that Defendant made and sold more product than its production and sales records reflect.

> 2.    The District Court Did Not Err in Excluding Evidence Concerning Plaintiff's Off-the-Book Sales Claim

Plaintiff contends the district court erroneously excluded evidence that would have rebutted Defendant's evidence regarding the amount of product that could be produced with the oil purchased by Defendant during the relevant time period. We disagree.

Plaintiff principally complains that the district court erroneously excluded the Johnson deposition testimony, discussed above, regarding the number of oil-based products Cosmetic Labs could produce from a gallon of emu oil when it was manufacturing emu-oil product in 2002. However, the district court never excluded this testimony.

At trial, the district court addressed two aspects of Johnson's deposition testimony. The district court first declared Johnson's testimony regarding "who created the Blue-Emu mark" as "not relevant to the case anymore."[16] Then the district court addressed Johnson's deposition testimony regarding production calculations and elected to "carry over the issue about his calculations to the extent that it becomes an issue based on the actual documents that support the claim itself." After discussing deficiencies in Johnson's deposition testimony,[17] the district court stated again that the issue would be carried over: "I will give [Plaintiff's counsel] the courtesy of carrying over Mr. Johnson's testimony as to his calculations and to revisit the issue based on . . . [Defendant's] records."

We disagree with Plaintiff's contention that the district court "erroneously excluded . . . Doug Johnson's testimony, on relevance grounds . . . ." The district court's carrying over of the issue does not constitute an exclusion of Johnson's testimony. Most importantly, Plaintiff never requested a final ruling on the admissibility of Johnson's deposition testimony following introduction of

---

[16] In the first appeal, we affirmed the district court's grant of summary judgment in favor of Defendant on Plaintiff's trademark claim.

[17] The district court noted that Johnson has not had "any dealings involving this case or this product since 2002. His data about how much product his lab can produce based on quantities of oil does not generally address the claim that's in this case as to failure to pay royalties for unreported sales for the relevant time period because he was not involved."

29

Defendant's records.[18]  It was incumbent upon Plaintiff to seek admission of evidence presented in summary judgment briefing, as the court had earlier invited Plaintiff to do.

Plaintiff also stated in its Statement of the Case that the district court "excluded Andy Martin's testimony using accepted mathematics and [Defendant's] business records to explain the step by step calculation by erroneously classifying simple math as expert testimony subject to Rule 26 disclosure."  But Plaintiff did not provide any argument to support that assertion and that claim of error is waived.  *See, e.g., United States v. Jernigan*, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003) (finding that a party that had not argued an evidentiary issue in its brief but had only made "four passing references" to the issue in headings had waived the argument); *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1280 n.41 (11th Cir. 2012) (finding that a party waived an argument when, *inter alia,* the party only made a "bald and conclusory" statement in the summary of the argument and did not expand on this statement anywhere else in the initial brief).

---

[18]  Defendant cited Plaintiff's failure to obtain a ruling on Johnson's deposition testimony in opposing Plaintiff's post-trial motions and the district court relied on that fact in denying Plaintiff's post-trial motions.  Nevertheless, on appeal Plaintiff persisted in unequivocally stating that the district court excluded Johnson's testimony without addressing the district court having stated that "[Plaintiff never requested a final ruling on the admissibility of this testimony—a contention that [Plaintiff] does not appear to contest."  Plaintiff again ignored the issue in its reply brief on appeal, even though Defendant argued that "[Plaintiff] rested its case without ever attempting to introduce the deposition testimony of Mr. Johnson."  Absent an explanation from Plaintiff, we are compelled to conclude, as the district court did, that "[Plaintiff] abandoned any attempt to rely on Johnson's testimony at trial."

30

In any event, Plaintiff belatedly raised this argument post-trial and we see no basis to conclude the district court erred in excluding Martin's calculations as improper expert testimony under Federal Rule of Civil Procedure 26(a)(2), especially since Martin was unaware of the process used by Defendant's lab to make product during the relevant time period.  To the extent Martin was to testify regarding simple mathematical calculations derived from the 2002 sales order approximations, the jury was fully informed of Plaintiff's argument.  The district court correctly excluded any testimony applying those simple calculations, derived from a different process and different formulation, to the process used by Defendant's laboratory to produce product in the relevant time period absent foundation and proper disclosure under Rule 26.

## III.    CONCLUSION

For the reasons explained above, we **AFFIRM** the decision of the district court.

31